**SOUTHWESTERN BELL TELEPHONE COMPANY, Appellant,**

v.

**Clifford Ray McKINNEY, Appellee.**

No. 04–84–00140–CV.

Court of Appeals of Texas,
San Antonio.

Oct. 16, 1985.

Rehearing Denied Nov. 14, 1985.

Hubert W. Green, John T. Reynolds, San Antonio, for appellant.

Patrick Kelly, Paul E. Knisely, Spivey & Grigg, Austin, for appellee.

Before ESQUIVEL, BUTTS, REEVES, JJ.

ESQUIVEL, Justice.

This is an appeal from a judgment in a suit for damages rendered in favor of appellee, Clifford Ray McKinney (McKinney), against appellant, Southwestern Bell Telephone Company (Bell). We affirm.

McKinney sued Bell and Xerxes Corporation for personal injuries sustained as a result of an accident involving an overhead telephone line. McKinney non-suited Xerxes Corporation and dismissed it as a defendant in this case after Xerxes admitted in its amended pleadings and stipulated during trial that: (1) McKinney was its employee on the date and occasion in question; and (2) Xerxes on that date had in effect workers' compensation insurance covering all employees injured in the course and scope of employment. In spe-

cial issue number seven, the jury was asked to find the percentage of negligence that caused damage to Clifford Ray McKinney and was attributable to each of the parties. The jury answered special issue number seven by finding: (a) Southwestern Bell Telephone Company seventy-five percent (75%) negligent; (b) Xerxes Corporation fifteen percent (15%) negligent; and (c) Clifford Ray McKinney ten (10%) percent negligent. McKinney moved that the court disregard the jury's answers to questions number 3, 4 and 7(B), and that the court enter judgment for McKinney notwithstanding the jury's answers to such questions. The court rendered judgment on the jury verdict for McKinney in the sum of $375,275.50. Bell presents three points of error and McKinney presents three cross-points.

McKinney was hired to provide a road escort service for transport by Xerxes of two oversized storage tanks from Seguin to Corpus Christi. McKinney's job was to lead the rig carrying the tanks and to watch for overhead obstructions and to provide traffic clearance at intersections. At the corner of Highway 97 and Houston Street in Pleasanton, an overhead telephone line crossed the intersection and extended to Highway 281, one block to the west. As McKinney approached the intersection, he noticed the line appeared to be low but, nevertheless, proceeded through the intersection. The Xerxes rig followed McKinney's car through the intersection but as it did so the telephone line became caught on a flange attached to the top of the storage tank. As a result of the collision with the wire, a telephone pole was broken causing the line to sag at the neighboring intersection of Highway 281.

Several Xerxes employees tried unsuccessfully to remove the wire from the tank. McKinney exited his car and was standing in the midst of loose cables assisting the efforts to remove the line from the tank. While McKinney was so engaged, a truck on Highway 281 collided with the sagging telephone line causing the line to snap tight and in the process to entangle McKinney's leg. This entanglement resulted in: (1) a traumatic amputation of McKinney's right foot just above the ankle which necessitated the further amputation of the right leg to a point some six inches below the right knee; (2) lacerations and contusions on McKinney's chest and face; and (3) a closed head injury. The evidence at trial revealed that it was standard Bell practice to maintain their lines at a height of eighteen feet above a roadway. See TEX.REV. CIV.STAT.ANN. art. 1436a, § 1 (Vernon 1980). There was also evidence that at the time of the accident, the Xerxes truck and its load did not exceed a height of seventeen feet, six inches.

Even though there was a nonsuit, negligence issues were submitted to the jury against all original parties. In special issue number seven, the jury found that Bell was seventy-five percent (75%) negligent in the maintenance of the telephone line; that Xerxes was fifteen percent (15%) negligent in the manner in which it transported the tank; that McKinney was ten percent (10%) negligent; and that the negligence of the parties was the proximate cause of McKinney's injuries. The amount awarded plaintiff represented seventy-five percent (75%) of the total damages found by the jury.

In point of error number one, Bell states the trial court erred in rendering judgment for McKinney because there was no evidence charging Bell with knowledge of the defective condition of the line and hence there was no evidence which would raise a legal duty.

In point of error number two, Bell states that there is no evidence to sustain the jury's finding of negligence on the part of Bell.

Point of error three states that there is no evidence to sustain the jury's finding of proximate causation. In cross-point one, McKinney states that the trial court erred in rendering judgment for only seventy-five percent (75%) of his damages against Bell instead of ninety-percent (90%) because Bell was jointly and severally liable for all damages except the ten percent (10%) caused by McKinney's own negligence.

In cross-point of error number two, McKinney states that the trial court erred in rendering judgment for only seventy-five percent (75%) of the damages because Bell failed to obtain a judgment on its cross-claim for contribution against Xerxes and has not appealed the judgment as to Xerxes.

Cross-point of error number three states that the trial court erred in rendering judgment for seventy-five percent (75%) of the damages because the pleadings, evidence and stipulations established that McKinney was an employee of Xerxes and was covered by workers' compensation and therefore neither McKinney nor Bell had a cause of action against Xerxes for negligence and under the rule of joint and several liability, McKinney was entitled to ninety percent (90%) of the damages.

In reviewing a no evidence point, this court looks only at that evidence that tends to support the jury's verdict, and ignores all evidence to the contrary. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *Rocha v. Ahmad*, 676 S.W.2d 149, 155 (Tex. App.—San Antonio 1984, writ dism'd).

■ Furthermore, the scintilla rule applies when a vital fact must be inferred from other relevant facts which have been proved. In assessing a "no evidence" point, the scintilla rule is stated as follows: When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is, in legal effect, no evidence, and will not support a verdict or judgment. *Joskes v. Irvine*, 91 Tex. 574, 44 S.W. 1059 (1898).

The evidence showed that the telephone line which snagged on the Xerxes truck was owned and maintained by Bell. The line had been in place since 1949 and at the point where it spanned Highway 97, it was approximately 200 feet long from pole-to-pole. Bell's managerial employee, Rene Robles, the customer service supervisor for the area including Pleasanton, admitted that Bell had a "continuing duty" to check the height of its overhead lines and to maintain them at least eighteen feet above a public roadway. Robles further testified that nobody other than the telephone company had the duty or responsibility to keep the lines at their proper height. McKinney's expert witness, D. Segall, Jr., a mechanical and electrical engineer, testified that the eighteen foot height requirement for utility lines over roadways is the minimum standard in the industry as set forth and recognized in the National Electric Safety Code. Segall also testified that eighteen feet is the minimum height requirement as stated in Bell's own manual regarding placement of lines over a roadway.

The testimony further showed that the Texas Highway Department grants permits for transporting oversized loads on the state's highways. Xerxes obtained an oversized load permit from the Texas Highway Department transportation of the two large tanks on May 31, 1981. The route, as designated in the permit, included the portion of Highway 97 through Pleasanton and also contained the standard legal requirement that the height of the vehicle and its load not exceed seventeen feet, six inches. Department of Public Safety Officers measured the Xerxes truck-trailer immediately after the accident in question and verified that its height did not exceed the legal limit. The witness Segall also testified, based on his familiarity with utility lines, that the telephone company can and should anticipate and foresee the likelihood of sag in its telephone lines over time, especially after thirty years.

The evidence further showed that Bell was chronically short-staffed in the area in question and that the maintenance crews merely "visually" observed telephone lines when they would happen to drive through the town where the lines were located. There were no specific times or occasions assigned for inspection or measurement of the height of telephone lines over the highways. Bell's employee, Robles, testified that he had never checked the height of the line in question over Highway 97 and he knew of no one else who had. A cable splicer for Bell, Luciano Luna, testified

that he traveled through the intersection where the accident occurred about once a week. He testified that it is part of his responsibility to observe the telephone lines and that he "keeps an eye out" for the lines, but that the company does not instruct him to measure them to be sure they are at the proper height. Edgar Kohlleppel, a Bell lineman, whose duties include maintenance of the line in question, testified that he did not inspect or measure the height of telephone lines over the public roadways on a regular basis, nor did anyone else. The testimony of Bell's employees also established that shortly after the accident in question, Bell rerouted the telephone lines through existing underground cable.

McKinney contends that although Bell did not have actual notice of the sagging wire, it did have constructive notice. If Bell had constructive notice of the defect in the telephone wire, a legal duty existed to maintain and inspect its telephone wires. Bell concedes that there exists a general duty for inspection. Therefore, the issue in this case is whether proof of the defect at the time of the accident is sufficient by itself to allow a jury to infer a legal duty, negligence, and proximate cause.

Bell contends that a defendant may be charged with notice of the condition only when a condition has been shown to exist for a sufficient length of time and refers us to the following cases: *General Telephone Co. of the Southwest v. Fennen*, 568 S.W.2d 407, 409 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ); *Hill v. Dallas Railway & Terminal Co.*, 235 S.W.2d 522 (Tex.Civ.App.—Dallas 1950, writ ref'd n.r. e.); *Ortiz v. El Paso Electric Co.*, 126 S.W.2d 515, 517 (Tex.Civ.App.—El Paso 1939, no writ). In *General Telephone Co.*, the facts are distinguishable from the case at bar. An operator of a crop duster sought recovery for personal injuries in a negligence action when his airplane crashed into defendant's telephone wires. Plaintiff contended that the concealed poles and lines created a dangerous condition and that defendant was therefore negligent in failing to warn of the existence of the condition. The appellate court found no evidence in the record that defendant owned or was responsible for the lines at the time of the accident or for any considerable length of time so as to infer a duty on the part of the defendant. This differs from the case at bar where appellant acknowledges its ownership of the telephone lines by its continuing, if only visual, inspection of the wires.

The court in *Hill* dealt with a suit for the death of the decedent resulting when the decedent, as a cable splicer, came into contact with a high voltage feeder line belonging to the defendant. The issue was whether there was any evidence to support the conclusion of fact that the failure of Dallas Railway to insulate its high voltage line was the proximate cause of decedent's death. Even though the evidence revealed that it would have been possible to insulate the wires at the place of injury, the appellate court found that this was of no value at all in the absence of knowledge of the special condition created by the erection of a new building and subsequent movement of the telephone wire.

In the instant case, there was no special condition as existed in *Hill*. McKinney only faced a defective condition. The defective condition was a sagging telephone wire.

In *Ortiz*, the plaintiff sued El Paso Electric Company for damages occasioned by the wrongful death of the plaintiff's son by electrocution. The deceased had fallen onto a public highway when a pole carrying high tension power transmission wires was struck by an automobile. Plaintiff alleged that the defendant was negligent in failing to discover the dangerous condition of its wire. Bell urges that *Ortiz* stands for the proposition that the duty owed by the power company is activated if the defect is discovered by the defendant within a reasonable time. However, a closer reading of the court's decision in *Ortiz* reveals that the court held: "Power companies must exercise ordinary care to correct a dangerous condition in its wires within a reason-

able time after it discovers, *or in exercise of reasonable care, should have discovered, the condition." Ortiz v. El Paso Electric Co.*, 126 S.W.2d 515, 516 (Tex.Civ.App. —El Paso 1939, no writ). (Emphasis supplied). We continue to adhere to this proposition.

Bell contends that there is a lack of evidence which fails to trigger its duty to reasonably inspect. Bell asserts that its visual inspection program, original installation of telephone wires to the proper height, and safe history of the wires in question, illustrates the reasonable care with which the wires were maintained. According to Bell, McKinney's injury was the first indication of the defective condition of the wire. Therefore, Bell argues, there is no competent evidence raising a duty or supporting the finding of negligence or proximate cause. We disagree with Bell.

■ The elements of actual negligence are: The existence of a duty on the part of one party to another; a breach of the duty; and damages to the party to whom the duty was owed proximately caused by the breach of duty. *Rosas v. Buddies Food Store*, 518 S.W.2d 534 (Tex.1975); *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). Bell argues that although it owed a duty to reasonably inspect and maintain its wires, that duty was not triggered because McKinney failed to give actual or constructive notice to Bell.

■ As a general rule, a plaintiff has failed to meet his fundamental burden of proof where the record is devoid of any testimony that would impute actual or constructive knowledge to a defendant. *R.R. Hutson v. City of Houston*, 418 S.W.2d 911, 914 (Tex.Civ.App.—Houston [14th Dist.] 1967, writ ref'd n.r.e.). The rule also applies where the record is silent as to the length of time the defective condition existed or might have existed. *Id.*

■ However, the testimony in the case before us indicates that constructive notice may be inferred. The witness Robles testified that Bell was aware of a continuing duty to maintain its overhead lines. The witness Luna's testimony showed that the use of a fiberglass, telescoping, "measuring pole," for inspections was quick, convenient, and inexpensive. Bell's own employees established that it was actually cheaper for Bell to bury the lines underground than to string them overhead. Despite this testimony, Bell maintains that it has no duty to inspect, to repair, or to warn without notice or knowledge of the defective condition. We cannot agree. The duty of care owed by Bell does not arise from its being made aware of a defective condition by a prospective plaintiff. McKinney and all users of the underline roadway are entitled to expect that the Bell will exercise reasonable care to make the overhead wire safe. A visual inspection program of the type conducted by Bell is insufficient. Bell had the duty to ascertain the condition of its telephone wires and to give intelligent warning to those who might use the underline public roadway.

In addition, Xerxes had no choice as to the route it could take. The Texas Highway Department designated the route oversized loads would take. Xerxes took the necessary precautions of hiring McKinney to guide the vehicles and act as an escort. McKinney does not deserve to be saddled with Bell's duty of inspection and measurement.

■ The fact that an accident occurred is not evidence of negligence. *Hardy v. McMillar*, 492 S.W.2d 381, 382 (Tex.Civ. App.—Waco 1973, no writ). However, Bell owned and was responsible for the lines at the time of the accident. The lack of a consistent inspection and maintenance program, the availability of inexpensive measurement tools to prevent injuries, the chronic understaffing and the later inexpensive burying of the telephone lines are all factors from which a jury could infer that Bell failed to exercise due care.

■ In order that proximate cause may be established, both elements of cause in fact and foreseeability must be shown by direct or circumstantial evidence. *Fuentes*

*v. Gentry,* 628 S.W.2d 459, 461 (Tex.App.— Amarillo 1981, no writ). Cause in fact is established by evidence that a negligent act or omission was a substantial factor in bringing about the injury. *Id.* Under the evidence and facts presented by the record in the instant case, the jury had adequate opportunity to infer that Bell's omission of inspection and maintenance was a substantial factor leading to the circumstances which placed McKinney in danger. Foreseeability is established by evidence that a person of ordinary intelligence and prudence "should have perceived the possibility of danger in the situation he entered or created." *Id.* at 461, 462. There is no requirement that McKinney should have anticipated the danger or scope of injuries that were to come. Therefore, Bell's argument that McKinney noticed the telephone wire was low, yet proceeded under it, is not determinative. In *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 295 (Tex. 1983), our Supreme Court adopted the rule stated in section 343 of the Restatement (Second) of Torts. Section 343 states that an occupier of premises may be liable for harm to invitees caused by a dangerous condition if the occupier: "(1) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees; and ... (2) fails to exercise reasonable care to protect them against the danger." The court in *Corbin,* went on to hold that an owner of property is considered to have constructive knowledge of any defect or dangerous condition "that a reasonably careful inspection would reveal"; and liability depends on whether he acted reasonably in light of what he knew or should have known about the risk accompanying a premise's condition, not on whether a specific set of facts or specific breach of duty is established. *Id.* at 296. The court went on to state that in all negligence actions the foreseeability of the harmful consequences resulting from a particular conduct is the underlying basis for liability.

■ Since this is a no evidence review, we look at only that evidence that supports the jury's verdict. Applying that standard and the rules in *Corbin* to the facts at bar, the jury could conclude that Bell's visual inspection procedure was inadequate, and that it was foreseeable to Bell that a sag in a 200 foot phone line would occur over the period of time in question. Since Bell did not exercise due care in the inspection and maintenance of their telephone wire, Bell failed to discover the unreasonable risk caused by the sagging wire.

Furthermore, Bell has conceded there exists a duty to maintain its telephone wires for the safety of those who use the underline public roadway. That Bell was negligent in maintaining the telephone wire and that such negligence proximately caused the injury may be inferred from the circumstances surrounding the event or happening. *See Grossman v. Tiner,* 347 S.W.2d 627, 629 (Tex.Civ.App.—Waco 1961, writ ref'd n.r.e.).

■ Bell is not being made an insurer. This court distinguishes the instant case from cases where the event or area is universally harmless, and where it was held:

> If a thing is generally supposed to be universally harmless, and only a specialist would foresee that in a given case it would do damage, a person who did not foresee it and who had no warning would not be held liable for the harm. If men were held answerable for everything they did which was dangerous in fact they would be held for their acts from which harm in fact ensued.

*Camp v. J.H. Kirpatrick Co.,* 250 S.W.2d 413, 419 (Tex.Civ.App.—San Antonio 1952, writ ref'd n.r.e.); *Hodges v. Nix,* 225 S.W.2d 576, 581 (Tex.Civ.App.—Galveston 1949, no writ); *Smith v. Safeway Stores,* 167 S.W.2d 1044, 1046 (Tex.Civ.App.—Fort Worth 1943, no writ). Bell obviously knew of the potential danger to drivers because it implemented an inspection program. It had a duty to exercise such a program with reasonable care. The statutory minimum height requirement for telephone wires placed Bell on notice that such a roadway

would be used by drivers of oversized loads who conformed to a designated route set by the State of Texas. It was Bell's duty to preserve the height of its overhead lines for the safety of all who use the public roads.

In addition, testimony from the witness Robles supported the contention that Bell had superior constructive knowledge of any change in road conditions. The witness Robles testified that the telephone company's representative in charge of maintenance lived in Pleasanton. Furthermore, this representative would know whether any paving of the highways or streets had been done. This knowledge placed appellant on notice that a more stringent inspection program was necessary. Bell had superior knowledge and was in the best position to exercise its duty of reasonable care in maintaining its telephone wires. Accordingly, we hold that there was sufficient evidence for the trier of fact to find that Bell had constructive notice of the defective condition which was the proximate cause of McKinney's injury.

■■■ In his cross-points, McKinney asserts that the trial court erred in its judgment regarding the proportion of damages to which he should be entitled. Bell contends that it is clear from the record that the issue of proper apportionment of damages was considered by the trial court. Bell argues that: (1) McKinney's agreement to nonsuit Xerxes Corporation constituted a settlement and release of Xerxes' liability and that (2) McKinney was not an employee of Xerxes such that the Worker's Compensation Act did not bar Xerxes as a joint tortfeasor. We agree with Bell. While Bell would normally incur joint and several liability for all damages less the ten percent attributed to McKinney's negligence, the effect of the nonsuit of Xerxes Corporation was to release it from liability to McKinney. In *Rose v. Phister*, 607 S.W.2d 587, 590 (Tex.Civ.App.—Houston [1st Dist.] 1980, no writ), the court defined a settlement as an agreement by which the parties reached an understanding of disputed matters. The trial court at bar had ample opportunity, from the evidence presented, to impliedly find that McKinney intended his nonsuit of Xerxes Corporation to be a settlement. In addition to McKinney's formal announcement of nonsuit, the record reflects the following pertinent intention:

Q: I want to make sure you got—yesterday, you announced you were going to nonsuit them; is that right?

A: [Plaintiff] Yes sir.

Q: I believe your attorney filed a motion later, didn't he?

A: I believe so.

Q: And, you have argued not to make any further claim against Xerxes?

A: Yes, sir.

As the record illustrates, the trial court had enough evidence on which to construe McKinney's nonsuit as a settlement. *Cyprus Creek Utility Service Co. v. Mueller*, 640 S.W.2d 860, 863–64. The nonsuit operated as a release of Xerxes' liability and TEX.REV.CIV.STAT.ANN. art. 2212a, § 2(e) provides the following:

\* \* \* \* \* \*

(e) If an alleged joint tortfeasor makes a settlement with a claimant but nevertheless is joined as a party defendant at the time of the submission of the case to the jury (so that the existence and amount of his negligence are submitted to the jury) and his percentage of negligence is found by the jury, the settlement is a complete release of the portion of the judgment attributable to the percentage of negligence found on the part of that joint tortfeasor.

McKinney's cross-point of error one that the trial court erred in rendering judgment for only seventy-five percent (75%) of Clifford McKinney's damages against Southwestern Bell instead of ninety percent (90%) of the damages is overruled.

As to cross-point number two, since the trial court judgment was in favor of Bell on the issue of damages, Bell's cross-claim for contribution against Xerxes Corporation is moot.

In cross-point number three, McKinney may not point to Xerxes' amended pleadings as proof that Xerxes considered McKinney an employee. McKinney possessed the burden of requesting a special issue as to the employment relationship between McKinney and Xerxes Corporation. We agree with Bell that McKinney has failed to identify any stipulation in the record that McKinney was Xerxes' employee.

As a result, McKinney waived his employment as an issue of fact. TEX.R. CIV.P. 279. In addition, the testimony elicited on cross-examination by Bell clearly revealed enough evidence by which the trial court could base its judgment. Therefore, we hold that the trial court had ample evidence to conclude that McKinney was not a Xerxes employee and McKinney's cross-point of error number three is overruled.

Accordingly, the judgment of the trial court is affirmed.